UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

CHRISTAL LYNN WILLIAMS,       )
                              )
        Plaintiff,            )
                              )
v.                            )       Case No. 5:18-cv-1464-GMB
                              )
ANDREW M. SAUL,[1] Commissioner, )
Social Security Administration, )
                              )
        Defendant.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff Christal Lynn Williams filed an application for disability insurance benefits and an application for supplemental security income in 2011. Her alleged disability onset date is September 1, 2010. Williams' applications for benefits were denied at the initial administrative level. She then requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ held a hearing on May 14, 2013 and denied Williams' claims on June 21, 2013. Williams requested a review of the ALJ's decision by the Appeals Council, which reversed and remanded the decision. A different ALJ held a hearing in Williams' case on June 19, 2017. He denied Williams' claims on October 3, 2017. The Appeals Council declined review on July

---

[1] Andrew M. Saul became the Commissioner of Social Security on June 5, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Saul is substituted for Nancy Berryhill as the proper defendant in this case.

9, 2018. As a result, the second ALJ's decision became the final decision of the Commissioner of the Social Security Administration (the "Commissioner") as of July 9, 2018.

Williams' case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Under 28 U.S.C. § 636(c)(1) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the full jurisdiction of a United States Magistrate Judge. Based on its review of the parties' submissions, the relevant law, and the record as a whole, the court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED for proceedings consistent with this opinion.

## I. STANDARD OF REVIEW

The court reviews a Social Security appeal to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court will reverse the Commissioner's decision if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The court "may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner," but rather "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*,

84 F.3d 1397, 1400 (11th Cir. 1997) (citation and internal quotation marks omitted).

"Even if the evidence preponderates against the Secretary's factual findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). Moreover, reversal is not warranted even if the court itself would have reached a result contrary to that of the factfinder. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

The substantial evidence standard is met "if a reasonable person would accept the evidence in the record as adequate to support the challenged conclusion." *Holladay v. Bowen*, 848 F.2d 1206, 1208 (11th Cir. 1988) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). The requisite evidentiary showing has been described as "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The court must scrutinize the entire record to determine the reasonableness of the decision reached and cannot "act as [an] automaton[] in reviewing the [Commissioner's] decision." *Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987). Thus, the court must consider evidence both favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990).

This court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Grant v. Astrue*, 255

F. App'x 374, 375–76 (11th Cir. 2007) (citing *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994)).  There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II.  STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 416(i).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  Williams bears the burden of proving that she is disabled, and she is responsible for producing evidence sufficient to support her claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

A determination of disability under the Social Security Act requires a five-step analysis. 20 C.F.R. § 404.1520(a).  The Commissioner must determine in sequence:

(1) Is the claimant presently unable to engage in substantial gainful activity?
(2) Are the claimant's impairments severe?
(3) Do the claimant's impairments satisfy or medically equal one of the

specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4) Is the claimant unable to perform her former occupation?

(5) Is the claimant unable to perform other work given her residual functional capacity, age, education, and work experience?

*See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015).

"An affirmative answer to any of the above questions leads either to the next question, or, [at] steps three and five, to a finding of disability. A negative answer to any question, other than at step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (quoting 20 C.F.R. § 416.920(a)–(f)). "Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir. 1985)).

## III. FACTUAL BACKGROUND

Christal Lynn Williams was born in Columbia, South Carolina. R. 1297. She was 44 years old at the time of the ALJ's decision. R. 61. She currently lives alone in an apartment in Huntsville, Alabama. R. 62. Williams asserts that she suffers from the following impairments: hypertension, headache, chronic neck pain, chronic back pain, muscle spasms, degenerative joint disease, bilateral knee pain, arthritis, bilateral carpal tunnel syndrome, incontinence, gout, insulin resistance, chronic bronchitis, asthma, diabetes, insulin resistance, fibromyalgia, major depression,

adjustment disorder, generalized anxiety, post-traumatic stress disorder, and bipolar disorder. Doc. 17 at 9. On her disability report, Williams alleged that carpal tunnel, high blood pressure, knee and back problems, anxiety, depression, and pain stemming from a car accident limited her ability to work. R. 505. Williams was involved in a collision with a drunk driver in 2009. R. 1297.

Williams completed some high school education and later obtained her GED. R. 62. She also obtained a cosmetology certificate from Drake Technical College. R. 62. Williams has past work experience in the collections industry. She last worked for Medco, a collection agency for hospital bills. R. 63. She also worked in collections for CHECKredi and DirecTV. R. 63 & 1298. She served as a supervisor in these roles. R. 63. Williams also cut hair on the side. R. 63. She once was a manager at a Krystal fast food restaurant. R. 101. A Vocational Expert ("VE") classified Williams' past work as light and semiskilled, light and skilled, or sedentary and skilled. R. 102.

The ALJ held a hearing in Williams' case on June 19, 2017. R. 58. During the hearing, the ALJ posed the following hypothetical to the VE:

> I'd like you to assume a hypothetical individual the age, education and prior work history of the claimant. There's no lifting restrictions. There are safety precautions of no work on ladders, ropes or scaffolds, no work around dangerous moving machinery or at unprotected heights, no commercial driving. Hypothetical individual should have her own workstation, no assembly line work, no work where there is direct contact with people, meaning as a cashier. The hypothetical individual is limited to simple, unskilled work, can perform simple one

or two step jobs. The hypothetical individual can, I'm sorry, can understand and remember simple instructions. Hypothetical individual can sustain attention and concentration to simple tasks for two hour periods across an eight hour work day, five day work week with all customary work breaks. Hypothetical individual can have occasional contact with co-workers, supervisors and the general public. Hypothetical individual can work with objects and things rather than work assisting people.

R. 103. The VE testified that this hypothetical individual could not perform any of Williams' past work. R. 103. The VE testified that this person could, however, work as a bottling line attendant, an inspector, and a marker if she could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. R. 103 & 105. Williams' attorney asked whether this individual could find employment if she was required to miss three days of work each month. R. 105. The VE testified that these absences would not be tolerated. R. 106. Williams' attorney asked whether this individual could find work if she missed two days per month. R. 106. The VE also testified that this would not be acceptable. R. 106. However, the VE testified that this hypothetical individual could miss work one day per month. R. 106. Williams' attorney asked whether this individual could maintain employment if she had poor memory, poor understanding, and poor ability to follow simple unskilled instructions. R. 106. The VE said that she could not. R. 106.

At the hearing, the ALJ also posed the following hypothetical to the VE:

[H]ypothetical number two, same limitations expressed in hypothetical number one, would have the hypothetical individual limited to frequent use of the hands, can handle objects such as as small as a spoon,

toothbrush, fork, jewelry.

R. 105.  The VE testified that the second hypothetical individual also could perform work as a bottling line attendant, inspector, and marker. R. 105.  And the VE testified that this individual could miss one day of work per month, but no more. R. 106.  Upon further questioning by Williams' attorney, the VE testified that this second hypothetical individual could not perform any of the listed jobs if she had poor memory, poor understanding, and poor ability to concentrate and follow simple instructions. R. 107.

The ALJ issued his decision on October 3, 2017. R. 45.  Under step one of the five-step evaluation process, the ALJ found that Williams had not engaged in substantial gainful activity since September 1, 2010. R. 18.  The ALJ concluded that Williams suffers from the following severe impairments under 20 C.F.R. § 404.1520(c) and § 416.920(c): affective mood disorder, carpal tunnel syndrome, and morbid obesity. R. 18.  The ALJ noted that these medically determinable impairments significantly limit her ability to perform basis work activities. R. 18.  But the ALJ concluded at step three of the analysis that none of Williams' impairments satisfied or medically equals the severity of one of those listed in the applicable regulations. R. 19–20.

At steps four and five, the ALJ found that Williams has the residual functional capacity ("RFC") to perform work at all exertional levels with some limitations.

Specifically, the ALJ determined that

> the claimant has the residual functional capacity to perform work at all
> exertional levels with no lifting restrictions. She can frequently use her
> hands and handle small objects such as a spoon, fork, jewelry, and
> toothbrush; no work on ladders ropes or scaffolds; no work around
> dangerous moving machinery or unprotected heights; no commercial
> driving; she should have her own work station, and no assembly line
> work; no work where there is direct contact with people such as a
> cashier; she can perform simple unskilled work and perform simple one
> to two step jobs; can understand and remember simple instructions and
> sustain attention and concentration for the simple task for two-hour
> periods, across an eight-hour workday, five-day workweek, with all
> customary work breaks; can have occasional contact with the general
> public, coworkers and supervisors; and should work with things as
> opposed to working assisting people.

R. 22. Ultimately, the ALJ determined that Williams is unable to perform any past

relevant work. R. 42. But considering Williams' age, education, work experience,

and RFC, he found that there are jobs that Williams can perform that exist in

significant numbers in the national economy. R. 43. Therefore, the ALJ concluded

that Williams is not disabled within the meaning of the Social Security Act. R. 54.

Based on these findings, the ALJ denied Williams' claims. R. 44.

## IV. DISCUSSION

Williams presents five issues on appeal: (1) the ALJ abused his discretion in

failing to determine the severity of Williams' impairments; (2) the ALJ abused his

discretion in finding that Williams did not have an impairment or combination of

impairments that medically equals the severity of one of the listed impairments;

(3) the ALJ did not properly evaluate Williams' complaints of pain as required under

the Eleventh Circuit's pain standard; (4) the ALJ failed to accept the opinion of the treating physician without good cause; and (5) the ALJ erred in his determination of Williams' RFC. Doc. 17. The court first turns to Williams' first and fourth contentions. The court then will address Williams' second contention. Because the court agrees with Williams that the ALJ abused his discretion in finding that Williams did not satisfy a listed impairment, it declines to address her remaining arguments.

## A.    Severity of Impairments

Williams alleges that the ALJ erred in determining that many of her impairments should be classified as non-severe. Doc. 17 at 10. However, because the ALJ considered both Williams' severe and non-severe impairments when determining her RFC, the ALJ did not commit reversible error in classifying certain impairments as non-severe.

A determination of disability under the Social Security Act requires a five-step analysis. At step one, the ALJ determines whether the claimant has engaged in any substantial gainful employment. At step two, the ALJ determines whether the claimant suffers from any severe impairments. An "impairment is [] considered severe if it [] significantly limit[s] the claimant's physical or mental ability to do basic work activities." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984). Step two "acts as a filter; if no severe impairment is shown the claim is denied, but the

finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987); *see also Hearn v. Comm'r, Soc. Sec. Admin.*, 619 F. App'x 892, 895 (11th Cir. 2015) ("Thus, the finding of any severe impairment, whether or not it results from a single severe impairment or combination of impairments that together qualify as 'severe' is enough to satisfy step two."); *Hamilton v. Colvin*, 2016 WL 613888, at *3 (N.D. Ala. Feb. 16, 2016) (finding that "the ALJ could not have committed any error at step two because he found that the claimant had a severe impairment or combination of impairments and moved on to the next step in the evaluation, which is all that is required at step two"). This is because "the ALJ must consider the applicant's entire medical condition in determining whether the applicant can return to her past work (step four), and if not, whether the applicant can perform other work available in the national economy (step five)." *Jamison*, 814 F.2d at 588. Thus, so long as the ALJ finds at least one severe impairment, he is required to move to the next steps, at which point he must consider all of the claimant's impairments—regardless of whether the impairments meet the definition of "severe." Consequently, any error at step two is harmless if the ALJ first finds a severe impairment and later considers all the claimant's impairments. *See Hearn*, 619 F. App'x at 895 ("Any error at step

two was harmless because the ALJ found in Hearn's favor as to impairment, and the ALJ properly noted that he considered Hearn's impairments in the later steps."). "In other words, the ALJ's failure to find a particular impairment severe is not reversible error if the ALJ found other severe impairments." *Hamilton*, 2016 WL 613888, at *9 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Here, the ALJ determined that Williams suffered from the severe impairments of affective mood disorder, carpal tunnel syndrome, and morbid obesity. R. 18. In determining Williams' RFC, he considered all of her medical conditions, both severe and non-severe. He explicitly articulated that "[a]ll of the claimant's impairments have been considered in combination without regard to whether any impairment if considered separately would be vocationally relevant." R. 42. The ALJ discussed Williams' mental impairments at length. R. 24–27. He specifically addressed counsel's allegations that Williams suffers from anxiety, adjustment disorder, depression, post-traumatic stress disorder, and bipolar disorder. R. 24. The ALJ also considered the treating physician's diagnoses of hypertension, incontinence, and gout. R. 31. However, as discussed below, the ALJ assigned little weight to these opinions because the diagnoses were based on Williams' subjective complaints and not on objective medical evidence. R. 31. The ALJ evaluated Williams' complaints of back pain, knee pain, and muscle spasms. R. 32. He considered the treating

physician's opinion regarding Williams' chronic bronchitis and exposure to fumes and noxious odors. R. 33.

The ALJ acknowledged that he considered both Williams' severe and non-severe impairments when determining her RFC. R. 27. Regarding any conditions that did not explicitly appear in his opinion, the ALJ observed that

> the overall evidence of record supports a finding that any other condition, *not specifically mentioned in this decision*, but that may be mentioned briefly in the record is not considered severe. In reviewing the record, special attention was given to the duration and frequency of medical conditions for which the claimant sought treatment. Therefore, the undersigned finds that those impairments that are not specifically mentioned reveal only a slight abnormality having such minimal effect on an individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience and are therefore, non-severe.

R. 27. To conclude, by finding three severe impairments and considering all of Williams' impairments when determining her RFC, the ALJ did not commit reversible error.

**B.      Treating Physician's Opinion**

Williams asserts that the ALJ failed to articulate good cause for disregarding the opinion of her treating physician, Dr. Marie Cebert. Doc. 17 at 55–60. "In evaluating medical opinions, the ALJ considers many factors, including the examining relationship, the treatment relationship, whether the opinion is amply supported, whether the opinion is consistent with the record and the doctor's specialization." *Kelly v. Comm'r of Soc. Sec.*, 401 F. App'x 403, 407 (11th Cir. 2010)

(citing 20 C.F.R. §§ 404.1527(d) & 416.927(d)).  "The opinions of non-examining, non-reviewing physicians, are entitled to little weight when contrary to those of an examining physician, and taken alone, they do not constitute substantial evidence." *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 901 (11th Cir. 2012).  The opinions of examining physicians are given more weight than those of non-examining physicians, and the opinions of treating physicians are given substantial weight unless the ALJ shows good cause for not doing so. *See id.*  "This Court has concluded that 'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240–41 (11th Cir. 2004).  "[T]he opinion of a treating physician may be rejected when it is so brief and conclusory that it lacks persuasive weight or where it is unsubstantiated by any clinical or laboratory findings." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983).

In any event, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  This is because the "ALJ is not allowed to make medical findings or indulge in unfounded hunches about the claimant's medical condition." *Smith v. Astrue*, 641 F. Supp. 2d 1229, 1233 (N.D. Ala. 2009).

"In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence. *Id.* (internal citation omitted).

"In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The court cannot affirm the ALJ's decision "simply because some rationale might have supported" it. *Winschel*, 631 F.3d at 1179 (internal citation omitted). However, "the ultimate determination of disability is reserved for the ALJ." *Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923 (11th Cir. 2007); *see also Harris v. Astrue*, 546 F. Supp. 2d 1267, 1281 (N.D. Fla. 2008) ("The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.").

Here, Dr. Cebert provided three sources of evidence for her opinions: her treatment notes, several To-Whom-It-May-Concern letters, and medical source opinion forms. The ALJ demonstrated good cause for assigning the opinions in these records little or no weight. The ALJ rejected Dr. Cebert's opinions for four primary reasons: (1) Dr. Cebert relied entirely on Williams' subjective complaints; (2) Dr.

Cebert's findings are not supported by objective medical evidence, (3) Dr. Cerbert's opinions are conclusory, and (4) Dr. Cebert's findings are inconsistent with other medical opinions. The ALJ also reasoned that the limitations identified by Dr. Cebert "were not bolstered by the evidence, the evidence supports a contrary finding[], or the limitations were conclusory or inconsistent with [Dr. Cebert's] own medical records." R. 35. The court will address each piece of evidence provided by Dr. Cebert in turn.

### 1. Treatment Notes

The ALJ properly discounted Dr. Cebert's treatment notes, which are conclusory and unsupported by objective medical evidence. *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987) ("The Secretary properly discounted [the doctor's] opinion that [the claimant] was totally disabled because it was not supported by objective medical evidence and was merely conclusory."). Williams argues that Dr. Cebert "examined Ms. Williams, she made her diagnoses, and then formulated a plan based upon her clinical and laboratory findings." Doc. 17 at 56. But, to borrow a phrase from the ALJ, Dr. Cebert's treatment notes contain "scant objective documentation." R. 24. The treatment notes span the time period from 2011 through 2017, yet only one laboratory test is included. R. 1042–44. The test, conducted in June 2016, reflects information like Williams' hemoglobin levels. R. 1042. However, neither Dr. Cebert's treatment notes nor the plaintiff's briefing

explain why this test was conducted, what helpful information the test revealed, or how the clinical findings factored into Dr. Cebert's treatment of Williams.

Instead, the treatment notes consist almost entirely of Williams' subjective complaints, which are "unsubstantiated by any clinical or laboratory findings." *See Bloodsworth*, 703 F.2d at 1240. Dr. Cebert's treatment notes contain only checks in a preprinted column indicating whether Williams' skin, head, eye, ears, nose, mouth, throat, neck, lymph nodes, chest, breast, heart, and lung are normal; a list of medical conditions; drugs to be prescribed; and subjective complaints. Sometimes, the treatment notes reflect nothing but the checkmarks in the preprinted column and a list of medical conditions. For example, Dr. Cebert examined Williams on July 29, 2011. R. 882. The treatment notes from that date include only the checkmarks in the preprinted column, the word "General," and a list that reads "A/P, pedal edema, HTN, and HA." R. 882. The treatment notes that do contain more detail are never accompanied by objective evidence but instead consist entirely of Williams' subjective complaints. For example, Dr. Cebert might write that "pt states panic attack" or "has difficulty w/sleep," but her notes would not reflect that she employed any objective testing or elicited a detailed description of Williams' symptoms. R. 885. Dr. Cebert's treatment notes are not entitled to substantial weight because the notes are not accompanied by objective medical evidence and are conclusory. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) ("A

treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").

Additionally, Dr. Cebert's treatment notes are contradicted by other medical evidence. For example, Dr. Cebert frequently lists conditions like "back pain," "knee pain," and "carpel tunnel," but these conditions are not supported by the opinions of other medical professionals. Dr. Eston Norwood evaluated Williams on March 9, 2017. R. 1283. Although Dr. Norwood found that Williams had only 50% of normal lumbar rotation, he also found that she had good range of motion in her neck and limbs. Williams was able to perform normally in finger to nose and heel to shin tests. Williams could rise from a sitting position and walk without assistance. She could open and close her fist, open and close a safety pin, and button and unbutton. Dr. Norwood recorded that Williams had subjective complaints of back pain, but noted that she had no objective neurological deficit or evidence of physical neurological impairment preventing her from working. R. 1283–86.

Treatment notes from the Orthopedic Clinic reveal similar findings contradicting Dr. Cebert's opinions. Williams met with Dr. Ginger Bryant at the Orthopedic Clinic in Huntsville on September 10, 2012. R. 951. Dr. Bryant found that Williams had full range of motion in both of her knees. R. 951. Dr. Bryant explained that Williams has mild arthritis but no injuries. R. 951. In June 2012, Dr. Bryant conducted a physical examination of Williams and found that she had a good

range of motion in the hip, knee, and ankle. R. 952. An MRI did not reveal any specific injury to Williams' knees. R. 952–53. Dr. Bryant counseled Williams about her obesity and its effects on her knees, and told Williams that pain medication was not the answer to her arthritis. R. 951.

For all of these reasons, the ALJ articulated good cause for assigning little weight to Dr. Cebert's opinions. The ALJ correctly reasoned that Dr. Cebert's treatment notes "lack even cursory objective tests [and] do not support limitations to the subjective statements of the claimant." R. 35. Additionally, other medical sources contradict Dr. Cebert. Accordingly, the opinions found in Dr. Cebert's treatment notes are not entitled to the customary substantial weight afforded treating physicians.

### 2.    *To-Whom-It-May-Concern Letters*

Dr. Cebert submitted four one-page letters to the Social Security administration on Williams' behalf. R. 966, 991, 993 & 1151. In these letters, Dr. Cebert identified Williams' medical conditions and her medications. Dr. Cebert wrote that Williams has mentioned that she has difficulty standing, sitting, and focusing her attention. R. 966. Dr. Cebert also stated that Williams self-reported that her hands cramp when she uses them for an extended period of time. R. 991, 966 & 1151. Dr. Cebert opined that Williams is a possible candidate for disability. R. 991, 966 & 1151. The ALJ identified the following opinions from Dr. Cebert's

letters:

> [D]ue to the claimant's incontinence, pedal edema, and hypertension for which she takes a diuretic, she would need to take frequent bathroom breaks. Due to her carpal tunnel, she has cramping in her hands when she used them [for] long periods of time. Due to gout, back and knee pain, she has difficulty walking, standing, or sitting for long periods of time without breaks. Additionally due to her anxiety, she has difficulty focusing and/or staying on task.

R. 31. Ultimately, the ALJ assigned "very little weigh to these statements." R. 31. He did so because Williams requested that the letters be written,[2] the conditions and limitations identified in the letters were inconsistent with Dr. Cebert's treatment notes, Dr. Cebert relied heavily on Williams' subjective complaints, and the opinions were conclusory. R. 31. The court finds that the ALJ properly assigned little weight to the opinions expressed in these letters because they are conclusory and unsupported by objective medical evidence. *See Johns v. Bowens*, 821 F.2d 551, 555 (11th Cir. 1987).

For example, in her letters, Dr. Cebert does not point to any objective evidence to support the assertion that Williams is incontinent. A review of the treatment notes similarly reveals no supporting objective documentation of incontinence. As discussed above, the treatment notes consist almost entirely of Williams' subjective complaints and are "unsubstantiated by any clinical or laboratory findings." *See*

---

[2] During a patient visit on August 28, 2015, Dr. Cebert noted that "pt needs letter indicating difficulty with prolonged standing" R. 1149.

*Bloodsworth*, 703 F.2d at 1240. Dr. Cebert provides no objective testing or laboratory results to support the assertion that Williams is incontinent, takes a diuretic, or requires frequent bathroom breaks. The treatment notes do contain the letters "HTN," which presumably refer to concerns about hypertension. Occasionally the word "Clonidine" appears in the treatment notes.[3] But there is no mention of a diuretic, constipation, or incontinence. There is no explanation of the basis for making the notations "HTN" and "Clonidine" or a description of symptoms suggesting incontinence.

Occasionally, the notation "GERD"[4] appears in Dr. Cebert's treatment notes, but again this note is not accompanied by an explanation, a description of symptoms, or objective evidence. R. 887 & 885. Occasionally "GI" appears, but apart from a GERD notation in February 2011, the GI notation is never accompanied by positive symptoms. R. 887, 960, 961, 972 & 1232. On May 14, 2012, Dr. Cebert recorded that Williams' hypertension and high blood pressure were controlled by multiple medications. R. 962. Records from Village Healthcare, where Dr. Cebert worked, do indicate that Williams was prescribed Verapamil and Clonidine. R. 970–71, 1034, 1037–38 & 1253. However, there is no indication in the treatment notes that

---

[3] Clonidine is a blood pressure medication that can cause constipation. CLONIDINE HCL SIDE EFFECTS BY LIKELIHOOD AND SEVERITY, https://www.webmd.com/drugs/2/drug-11754-24/clonidine-hcl-oral/clonidine-oral/details/list-sideeffects (last visited February 10, 2020).

[4] The acronym "GERD" stands for gastroesophageal reflux disease, a digestive disorder that affects the lower esophageal sphincter. GASTROESOPHAGEAL REFLUX DISEASE, https://www.webmd.com/heartburn-gerd/guide/reflux-disease-gerd-1#1 (last visited on February 10, 2020).

Williams suffered side effects from these medications. R. 962. Once, on December 12, 2011, Dr. Cebert recorded "Depression/Need to go," which perhaps could refer to incontinence. R. 878. However, there is no further explanation or objective evidence explaining the "Need to go" notation. R. 878. In other words, there is simply no objective evidence to back up the conclusory assertion that Williams is incontinent or needs to take frequent bathroom breaks. *See Bloodsworth*, 703 F.2d at 1240 ("[T]he opinion of a treating physician may be rejected when it is so brief and conclusory that it lacks persuasive weight or where it is unsubstantiated by any clinical or laboratory findings.").

Dr. Cebert's claims regarding pedal edema, carpal tunnel, anxiety, trouble focusing, and difficulty walking, standing, or sitting are similarly conclusory and unsupported by objective evidence. Again, Dr. Cebert does not point to any objective evidence in her letters, and her treatment notes do not support her assertions in the letters. For example, "pedal edema" appears a few times in the treatment notes. R. 882, 883 & 958. But the notation is not accompanied by objective tests, a description of symptoms, or an explanation of the diagnosis. Similarly, any mention of carpal tunnel, anxiety, and difficulty ambulating is missing any objective findings in support. R. 11. Instead, the treatment notes reflect only the claimant's subjective complaints or an apparent diagnosis without explanation. "A treating physician's report may be discounted when it is not accompanied by

objective medical evidence or is wholly conclusory." *Crawford*, 363 F.3d at 1159.

Here, it was appropriate for the ALJ to reject Dr. Cebert's To-Whom-It-May-Concern letters because her opinions in the letters were not accompanied by objective medical evidence and were conclusory.

### 3. *Medical Source Opinion Forms*

Dr. Cebert also submitted medical source opinion forms on behalf of Williams. R. 995–96 & 1221–24. The forms ask the person completing them to check "yes or no" to questions such as "Are your patient's impairments likely to produce good days and bad days?" and "Does your patient have significant limitations in doing repetitive motion activities such as reaching, handling, or fingering?" R. 995–96 & 1221–24. The forms also ask the person completing them to check one of four boxes—constantly, frequently, occasionally, or never—to indicate how long the patient can do certain activities, like standing, walking, sitting, reaching, pushing, pulling, lifting or carrying. R. 995–96 & 1221–24. The forms also ask the doctor to use a checkmark to indicate whether the patient can constantly, frequently, occasionally, or never be exposed to extreme cold and humidity, vibration, fumes, moving mechanical parts, and other hazards. R. 995–96 & 1221–24.

On these forms, Dr. Cebert indicated that Williams' disability onset date was in 2009. R. 1221. She opined that Williams would have to miss work more than

three times per month. R. 1221. On the form Dr. Cebert completed in May 2013, she indicated that Williams could only sit and stand for ten minutes and walk for five minutes. R. 995. But Dr. Cebert opined that Williams could sit, stand, and walk for ten minutes in 2016. R. 1221. On these forms, Dr. Cebert indicated that Williams would need to lie down "as much as possible (4 to 6 hours)" due to the side effects from her medication R. 1221. She checked a box reflecting that Williams could never push, pull, climb, balance, kneel, crouch, or crawl. R. 1222. Dr. Cebert indicated that Williams could occasionally be exposed to fumes and could occasionally drive automotive equipment. R. 996 & 1223. In her opinion, Williams could never be near moving, mechanical parts or work in high, exposed places. R. 996 & 1223.

The court concludes that the ALJ has shown "good cause" for assigning little or no weight to the medical source opinion forms signed by Dr. Cebert. First, the forms are a series of questions to which Dr. Cebert responded by simply checking boxes with little to no explanation of her answers. R. 995–96 & 1221–24. The opinions therefore are conclusory and have limited probative value. Indeed, several courts have criticized "form reports" such as these where a physician merely checks off a list of symptoms without providing an explanation of the evidence that supports the decision. *See, e.g.*, *Wilkerson ex rel. R.S. v. Astrue*, 2012 WL 2924023, at *3 (N.D. Ala. July 16, 2012) (finding that the "form report completed by Dr. Morgan

and submitted by [plaintiff]'s counsel consisted of a series of conclusory 'check-offs' devoid of any objective medical findings"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best[.]"); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011) (holding that he use of a "questionnaire" format typifies "brief or conclusory" testimony); *Hammersley v. Astrue*, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("[C]ourts have found that check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions."). This court agrees that there are significant inherent limitations in the utility of form reports.

Second, as explained by the ALJ, Dr. Cebert's treatment notes do not support the opinions stated in the medical source opinion statements. Although Dr. Cebert's treatment records contain notations of "chronic bronchitis," "back pain," "knee pain," and "anxiety," there are no objective tests in her notes to bolster these complaints. Instead, these notations appear to be based entirely on Williams' self-reported symptoms. Apart from these sorts of notations and check marks on a preprinted column indicating whether Williams' skin, head, eye, ears, nose, mouth, throat, neck, lymph nodes, chest, breast, heart, and lung were normal, there is no other information. The only abnormal checks Williams consistently received were for "movement" of the head, sinus tenderness, and post-nasal drip. But apart from

the notation "chronic bronchitis," there is no explanation of these symptoms. R. 877–88, 913–16, 955–62, 972–74, 1014–17, 1039–41, 1046-65, 1172–80, 1198–1200, 1250–52 & 1307–10. On a few occasions, Williams received an abnormal ear discharge notation. R. 1041, 1046, 1051, 1054, 1056, 1174, 1178, 1198–1200, 1231–32 & 1250–52. Dr. Cebert sometimes marked that Williams had sinus tenderness and post-nasal drip but did not include even a "chronic bronchitis" notation. R. 882, 883, 913 & 956. Simply put, nothing in the treatment notes from Dr. Cebert suggests the extreme limitations reflected in the medical source opinion forms.

For the reasons discussed above, the court concludes that the ALJ did not err in according little weight to the medical source opinions signed by Dr. Cebert. The ALJ clearly articulated his reasons for assigning little weight to these opinions and the court agrees with the ALJ that the opinions are not supported by the treatment records and that the forms themselves are conclusory with limited probative value.

## C.    The Listings

Williams argues that the ALJ abused his discretion in determining that she did not have a physical or mental impairment or combination of impairments that satisfied a listed impairment in the Social Security regulations.

Williams contends that the ALJ abused his discretion in finding that she did not meet the listing criteria for anxiety disorder (Listing 12.06).[5] Doc. 17 at 29.

___

[5] In a heading of her brief, Williams also asserts that she satisfies the listing criteria for depression

The Listings of Impairments in the Social Security Regulations identify impairments severe enough to prevent a person from engaging in gainful activity. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1. If a claimant meets a listed impairment or otherwise establishes an equivalence, the regulations establish a disability. *See* 20 C.F.R. § 416.920(d). But if an impairment manifests only some of the criteria, then it does not qualify as a disability, no matter how severe the impairment. *Nichols v. Comm'r of Soc. Sec.*, 679 F. App'x 792, 795 (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

To meet the requirements of a Listing, a claimant must "have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). In other words, to "meet a Listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration requirement." *Proctor v. Comm'r of Soc. Sec.*, 2016 WL 4473187, at *4 (M.D. Fla. Aug. 25, 2016). The burden is on the claimant to show that her impairments meet a listed impairment. *Barron v. Sullivan*, 924 F.2d 227,

---

and bipolar disorder (Listing 12.04) and post-traumatic stress disorder (Listing 12.15). However, Williams' brief does not include any substantive discussion of these listings, and therefore she has waived these arguments. *See Singh v. U.S. Atty. Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) ("[A]n appellant's brief must include an argument containing appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.") (quotation marks omitted). "[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

229 (11th Cir. 1991). The regulations also provide that the claimant "must furnish medical and other evidence that [the Commissioner] can use to reach conclusions about [her] medical impairment(s)." 20 C.F.R. § 404.1512(a). As referenced above, the claimant's impairment must "meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

A claimant can meet the listing for anxiety disorder by showing that she satisfies the criteria in paragraphs A and B of that listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. Alternately, the claimant may show that she meets the listing by satisfying the criteria in paragraphs A and C of Listing 12.06. The paragraph A criteria set forth clinical findings that medically substantiate a mental disorder. *See* Listing 12.00A. The criteria in paragraphs B and C describe functional limitations that would prevent any gainful employment.

To satisfy the paragraph B criteria of Listing 12.06, the claimant must establish that she has an extreme limitation in one, or a marked limitation in two, of certain areas of mental functioning. The listed areas are the claimant's abilities to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; and (4) adapt or manage herself. To satisfy the criteria in a paragraph C, a claimant must establish a mental disorder that is "serious and persistent" in that it has lasted for a period of at least two years and

there is evidence of both of the following: (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the mental disorder; and (2) marginal adjustment (that is, a minimal capacity to adapt to changes in your environment or to demands that are not already part of daily life).

Williams argues that she satisfies the paragraph A criteria (R. 29–32) and the paragraph B criteria. Doc. 17 at 29. However, Williams' argument relies on an old version of the listings, which were revised on September 26, 2016. The new listings went into effect on January 17, 2017. The outdated listings on which Williams relies provide the following:

> **12.06 *Anxiety-related disorders***: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>
> A. Medically documented findings of at least one of the following: 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms: a. Motor tension; or b. Autonomic hyperactivity; or c. Apprehensive expectation; or d. Vigilance and scanning; or 2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or 4. Recurrent obsessions or compulsions which are a source of marked distress; or 5. Recurrent and intrusive

recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (amended 2017). Williams focuses her arguments on alleged restrictions in her daily activities. To the extent these arguments relate to the current listings, the court has considered them. Williams makes no argument as to the paragraph C criteria.

The ALJ determined that Williams did not meet the Listing for anxiety disorder. R. 20. He found that Williams has only moderate limitations in the functional areas of understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. R. 21. The ALJ found that Williams has only mild limitations in the functional area of adapting and managing herself. R. 21. Accordingly, the ALJ concluded that paragraph B was not satisfied because Williams did not have a marked limitation in two domains of functioning or an extreme limitation in one domain. R. 21. As to

the paragraph C criteria, the ALJ found that the "record does not demonstrate medical treatment, mental health therapy, psychosocial supports, or a high structured setting that diminishes the symptoms and signs of the claimant's mental disorder, with claimant achieving only marginal adjustment." R. 22. The ALJ reasoned that "while the claimant demonstrated improvement with treatment for her anxiety disorder, even during period[s] of increased symptoms, the claimant was able to adapt to changes, including preparing simple meals, caring for her own personal needs, and interacting with others." R. 22. However, this court concludes that substantial evidence does not support the ALJ's determination that Williams fails to satisfy the paragraph B criteria.

The ALJ relied on Williams' function report to support his finding that she has only moderate limitations in understanding, remembering, or applying information. R. 21. The ALJ noted that Williams alleged she had problems with her memory, but on her function report she indicated that she is able to manage her personal needs and her finances. R. 21. He highlighted that Williams reported that she is able to shop in stores, read, and sing. R. 21. She does not need reminders to take her medication, although she will set an alarm to remind her to take medication at a specific time. R. 526. The ALJ also relied on the psychological examination conducted by Dr. John Rogers in March 2017. He noted that Dr. Rogers determined that Williams could repeat five digits forwards and eight digits backwards. R. 21.

The ALJ pointed out that Williams could discuss with Dr. Rogers her activities of the prior day and recall some general accurate information. R. 21.

The ALJ also found that Williams has only a moderate limitation in interacting with others. Here, the ALJ again relied on Williams' function report. R. 21. He noted that Williams alleged that she tends to stay by herself, but also reported that she attends church services and participates in the church choir. R. 21. He highlighted that Williams went to a wedding in February 2017 and sang in front of fifty guests. R. 21. He discounts Williams' claim that she has problems getting along with others by noting that Dr. Rogers found Williams' conversation and speech to be normal. R. 20. The ALJ also points to Williams' records from the Mental Health Center, which reveal that she participated well in group therapy. R. 21.

With respect to the criteria associated with concentrating, persisting, or maintaining pace, the ALJ concluded that Williams had only a moderate limitation. R. 21. Again, the ALJ relied on Williams' function report. R. 21. He noted that Williams reported she was able to pay her bills and handle a savings account when she had a job. R. 21. He noted that Williams reported that she could shop for food when she received her food stamps. R. 21. He pointed to Williams' testimony at the hearing that she could use a microwave, watch television, operate a remote control, and surf the internet. R. 21. The ALJ also relied on Dr. Rogers' report here, highlighting that Dr. Rogers found Williams' mental activity to be normal and did

not observe any loose associations or tangential or circumstantial thinking. R. 21. The ALJ pointed to Dr. Rogers' test results where Williams was able to interpret two simple proverbs. R. 21. The ALJ concluded by noting that a "review of the record finds no evidence the claimant has been diagnosed or prescribed medication for symptoms related to attention deficit hyperactivity disorder." R. 21. (Williams does not assert that she suffers from attention deficit hyperactivity disorder.)

The ALJ does not misrepresent the substance of Dr. Rogers' conclusions. But he has cherry-picked only those conclusions that do not support a finding of disability—and ignored the findings that do suggest disability. For example, Dr. Rogers observed that Williams' mood appeared anxious. R. 1299. After administering a Weschler Adult Intelligence Scale, Dr. Rogers concluded that Williams had a full scale IQ score of 70. R. 1299. Dr. Rogers administered a Boston Naming Test, on which Williams scored a 41 out of 60. R. 1301. Dr. Rogers reported that this score was "quite low but consistent with the expectations for someone functioning at her level of intelligence." R. 1301. Dr. Rogers recorded that Williams' attentional dependent cognitive skills appeared to be impaired, and noted that it was unclear whether this was due to organic problems or side effects from medication. R. 1301. He opined that Williams' immediate memory dependent cognitive skills were commensurate with her IQ, and that her executive functioning dependent cognitive skills were mildly impaired. R. 1302. He determined her

executive functioning dependent cognitive skills by administering a Trail Making Test. R. 1302.  On one portion of this test, Williams scored in the normal range, but she scored in the severely impaired range on the other component of the test. R. 1302.  In an "Implications for Employment" section of his report, Dr. Rogers concluded that the quality of Williams' daily activities is below average, that she has problems interacting with other people, and that her medication side effects impair her functioning. R. 1302.  Dr. Rogers diagnosed Williams with somatic symptom disorder, bipolar disorder, and unspecified anxiety disorder with posttraumatic stress features. R. 1303.

Even more problematic than the ALJ's failure to acknowledge the facts in the record tending to support a finding of disability is the ALJ's decision to assign little weight Dr. Rogers' opinion. R. 39.  The ALJ explained in detail why he assigned little weight to this opinion.  For example, he noted that Williams went to Dr. Rogers for a neuropsychological examination, but Dr. Rogers is not a neuro-psychologist and is not board certified in any area. R. 38.  The ALJ concluded that Dr. Rogers was "a PhD and not qualified to offer opinions after review of medical records," and he highlighted that Dr. Rogers was a one-time examiner. R. 38 & 39.

The ALJ concluded that "the undersigned assigns very little weight to the overall opinion of Dr. Rogers particularly on his lack of qualifications to present or interpret neurological tests." R. 29.  It is within the ALJ's discretion to discredit the

opinion of Dr. Rogers or to assign little weight to his opinions. But it is error for the ALJ to have assigned little weight to Dr. Rogers' opinion overall while simultaneously relying heavily on his opinions and findings to conclude that Williams is not disabled. This type of cherry-picking is forbidden. *See Dicks v. Colvin*, 2016 WL 4927637, at *4 (M.D. Fla. Sept. 16, 2016) ("However, it is clear that an ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."). Essentially, the ALJ "carved out" the helpful parts of Dr. Rogers' opinion and relied on these bits when determining that Williams did not satisfy a listing. *See Watkins v. Berryhill*, 2018 WL 3615995, at *4 (S.D. Ala. July 27, 2018) ("Of particular import to this Court, while the ALJ generally accorded 'significant weight' to the RFC assessment of non-examining, reviewing physician, Dr. Kenneth Cloniger, she 'carved out' Dr. Cloninger's 'findings' that Plaintiff could perform manipulative functions only occasionally."). But where Dr. Rogers' opinion did not comport with the ALJ's finding that Williams is not disabled, the ALJ found Dr. Rogers to be unqualified as a neuropsychologist, and deemed his entire opinion worthy of little weight. This does not satisfy the ALJ's burden to support his opinions with substantial evidence. The court concludes that the ALJ's finding that Williams does not meet a Listing is not supported by substantial evidence.

## V. CONCLUSION

For these reasons, the court concludes that the Commissioner's decision is not based upon the proper legal standards and substantial evidence. It is therefore ORDERED that the decision of the Commissioner denying benefits is REVERSED and this matter is REMANDED to the Administrative Law Judge for the purpose of issuing a new disability determination consistent with this opinion.

Pursuant to Federal Rule of Civil Procedure 54(d)(2)(B), Plaintiff's attorney is granted an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until 30 days after receipt of a notice to award benefits from the Social Security Administration. This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.

A final judgment will be entered separately.

DONE and ORDERED on February 13, 2020.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE